```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                   CASE NO. 1:15-CV-22463-MGC


 3

     HYDENTRA HLP INT. LIMITED        Miami, Florida
 4   A FOREIGN CORPORATION,           May 18, 2016
     DOING BUSINESS AS METART         Wednesday
 5
                     PLAINTIFF
 6         vs

 7   MAXIMUM APPS, INC.,              Scheduled 3:30 p.m.
     A FOREIGN COMPANY, DOING         3:46 p.m. - 4:43 p.m.
 8   DOING BUSINESS AS SEX.COM,
     CLOVER HOLDINGS LIMITED
 9   PARTNERSHIP, A FOREIGN COMPANY
     DOING BUSINESS AS SEX.COM,       Pages 1 - 41
10   FREDERIC VALIQUETTE, AN
     INDIVIDUAL, JOHN DOES 1 - 20
11                   DEFENDANTS

12   -----------------------------------------------------------

13            ORAL ARGUMENT AND STATUS CONFERENCE

14        BEFORE THE HONORABLE MARCIA G. COOKE
                  UNITED STATES DISTRICT JUDGE
15            WILKIE D. FERGUSON COURTHOUSE


16
     APPEARANCES:
17
     ON BEHALF OF PLAINTIFFS:     SPENCER D. FREEMAN, ESQ.
18                                Freeman Law Firm, Inc.
                                  1107 1/2 Tacoma Avenue South
19                                Tacoma, WA 98402
                                  sfreeman@freemanlawfirm.org
20

21                                AARON BEHAR, ESQ.
                                  BeharBehar
22                                1840 North Commerce Parkway
                                  Suite 1
23                                Weston, Florida  33326
                                  ab@aaronbeharpa.com
24

25
```

```
 1    APPEARANCES (continued):

 2

 3    ON BEHALF OF DEFENDANTS:        ALLEN PAIGE PEGG, ESQ.
                                      JASON D. STERNBERG, ESQ.
 4                                    Hogan Lovells LLP
                                      600 Brickell Avenue
 5                                    27th Floor
                                      Miami, FL 33131
 6                                    allen.pegg@hoganlovells.com
                                      jason.sternberg@hoganlovells.com
 7
                                      EVAN FRAY-WITZER, ESQ.
 8                                    Ciampa, Fray-Witzer, LLP
                                      20 Park Plaza
 9                                    Suite 505
                                      Boston, MA 02116
10                                    evan@cfwlegal.com

11
                                      BRADY JAMES COBB, ESQ.
12                                    Tripp Scott
                                      110 SE 6th Street
13                                    15th Floor PO Box 14245
                                      Fort Lauderdale, FL 33302-4245
14                                    bcobb@cobbeddy.com

15

16

17    STENOGRAPHICALLY
      REPORTED BY:              GLENDA M. POWERS, RPR, CRR, FPR
18                              Official Court Reporter
                                United States District Court
19                              400 North Miami Avenue, Room 08S33
                                Miami, Florida 33128
20

21

22

23

24

25
```

```
 1              (Call to the order of the Court:)

 2         COURTROOM DEPUTY:  All rise.

 3         THE COURT:  Good afternoon.  We're on the record in --

 4    I'm probably going to say this wrong -- Hydentra versus

 5    Maximum Apps, et al.

 6              For the record, appearing on behalf of the plaintiffs.

 7         MR. FREEMAN:  Good afternoon, Your Honor.  For the

 8    record, Spencer Freeman, and you did pronounce it correctly.

 9         MR. BEHAR:  Aaron Behar.

10         MR. HOLMAN:  Jason Holman.

11         MR. PEGG:  And good afternoon, Your Honor.  Allen Pegg

12    and Jason Sternberg from Hogan Lovells on behalf of the

13    defendant Clover Holdings, Limited.

14         MR. FRAY-WITZER:  And, good afternoon, Evan Fray-Witzer

15    for Maximum Apps and Frederic Valiquette.

16         THE COURT:  All right.  Counsel, I have two motions to

17    dismiss.  One filed by defendant Clover Holdings, Limited.

18              Has your process issue now been resolved?

19         MR. PEGG:  Your Honor, it's been resolved, in large

20    part, although, I think we still have a diligence argument

21    under the Harris case from the Eleventh Circuit, that given the

22    timing, nine-and-a-half months, that is, that it took the

23    plaintiff to at least, apparently, properly serve the right

24    document by the right person, on the right person in

25    St. Vincent, I still think we have a diligence argument.
```

```
 1          Although, Your Honor is correct to observe that the
 2    primary basis of the motion -- may I speak from the podium,
 3    Your Honor?
 4          THE COURT:  Yes, please.
 5          May have been cured.  But I still -- hold your thought
 6    there, counsel.
 7          But I did have docket entry number 44, which, I
 8    believe, are all the other defendants' motion to dismiss; am I
 9    correct?
10          MR. FRAY-WITZER:  Yes, Your Honor.
11          THE COURT:  Counsel for plaintiff, you may be seated.
12          Counsel, why don't we start with your motion to
13    dismiss, although, I think the issues for all of the defendants
14    are quite similar as to whether or not there's personal
15    jurisdiction.
16          MR. PEGG:  They are similar, Your Honor.  The common
17    denominator here is the operation of a website.  Although,
18    there are distinctions -- as Mr. Fray-Witzer and myself will go
19    through -- but I'd like to start off, so we have the personal
20    jurisdiction and the process arguments on behalf of Clover, as
21    we just discussed, I think that it makes the most sense to
22    start with the jurisdictional arguments.
23          But I do want to sort of set the table here to remind
24    us all about how we got here.  It's an interesting case.  We've
25    got a Cypress-based plaintiff suing three defendants, two in
```

1    Canada and one in St. Vincent, about the contents of a website

2    that's hosted -- not here, or anywhere in the United States,

3    but on servers in Canada.

4         And the only reason that we're here before Your Honor

5    taking up this docket is because the website is accessible

6    here.  The website is accessible in the United States.

7         The website is accessible worldwide.

8         THE COURT:  Further, if I were to follow -- and I'm

9    certain you have some very specific analysis -- if I were to

10   take this to the illogical extreme, it would open up anyone who

11   has a website that's accessible by anyone in Florida to suit in

12   Florida.

13        MR. PEGG:  It would open them up to suit before

14   Your Honor, exactly.  And, in fact, we will talk a little bit

15   about their argument that, well, we've got a contact in Florida

16   to the extent we, arguably, without any evidentiary support,

17   have a contract with an entity called Network Solutions, based

18   in Jacksonville.  Their domain name's registered with that

19   entity, that are not only in the United States.  So we'd be

20   entering -- we'd be opening up the literal worldwide

21   floodgates.

22        THE COURT:  But let's even go back to the issue with

23   the contract that you have with, I believe, the person that

24   manages your domain name; correct?  Registers --

25        MR. PEGG:  They're the registrar of the domain name.

1          THE COURT:  Okay.  They register your domain name, and

2     the contract says, for any issue you have with them; correct?

3          You, according to that contract, would subject your

4     suit to Jacksonville; right?

5          MR. PEGG:  Correct, Your Honor, that's the first part

6     of the clause.

7          THE COURT:  Okay.  The first part is that.

8          But isn't it their suit against you or your suit

9     against them, not for people extraneous to that relationship?

10         MR. PEGG:  That's correct, Your Honor.  And there's

11    case law that says that a non-party -- so this alleged contract

12    is between us, Clover, and Network Solutions -- a non-party,

13    being Hydentra, cannot enforce a forum selection clause in a

14    contract it's not a party to.

15         And as Your Honor noted in the MPS case, a forum

16    selection clause, even saying that suit should be brought in

17    Florida, is not sufficient.  Your Honor ruled that, Judge Marra

18    ruled that in an earlier case, as we cited in the brief, isn't

19    sufficient or even relevant on a personal jurisdiction

20    analysis.

21         And again, Your Honor, the second part of the clause

22    says, at least arguably, that if it's a suit between Clover and

23    a third party, relating to the use of a domain name, that suit

24    should be brought in Jacksonville.

25         First of all, the suit, obviously, isn't in

1    Jacksonville.  I'm not sure how that supports their argument at

2    all.

3         THE COURT:  I was going to say, even if I were to agree

4    with them, then I would still be dismissing for improper venue,

5    and it should go to the Middle District.

6         MR. PEGG:  Exactly, Your Honor.  But I think, more

7    importantly, and why we shouldn't do that is because this

8    suit -- these claims don't relate to the use of a domain name.

9         A domain name is, in this case, Sex.com.

10        None of these claims have to do with the use of the

11   domain name.  You're infringing my rights because I have

12   S-E-X-X.com registered and you have S-E-X.com registered, so

13   I'm suing about the domain name.

14        This suit is all about the contents of the website that

15   is hosted -- that is associated with that domain name, so

16   they're not a party to this contract with the clause.

17        Second of all, it's unauthenticated -- we'll get to

18   that -- this isn't even admissible evidence on a personal

19   jurisdiction analysis -- and the suit doesn't fit within the

20   parameters of the provision they're trying to bootstrap

21   themselves into.

22        THE COURT:  All right.

23        MR. PEGG:  So stepping back then to the initial part of

24   the analysis, as we set forth in our brief, they've got a

25   pleading issue to deal with, and they didn't deal with it.

```
 1              And let me walk through the reasons why.

 2              First, as we cited in our briefs, their amended

 3    complaint is suing three defendants.  Their jurisdictional and

 4    merits-based allegations make absolutely no distinction between

 5    the three defendants.

 6              All they say ever in their pleading is defendants did

 7    this, defendants did that, defendants' contacts with the United

 8    States.  That is impermissible, Judge.  That's impermissible

 9    under the Supreme Court case law that we cited, being Calder

10    versus Jones and Rush versus Savchuk.

11              And, in fact, in the later case, Rush, the Supreme

12    Court, in 1980, said it is "plainly unconstitutional to lump

13    allegations of personal jurisdiction against a group of

14    defendants."

15              We've got the District Court cases that say the same

16    thing.  And, in fact, we just issued a notice of supplemental

17    authority citing Your Honor to the recent case from Chief

18    Judge -- excuse me -- from Chief Judge Moore.

19              THE COURT:  I have that one, counsel.

20              MR. PEGG:  Yes.  Where Chief Judge Moore says, without

21    citing these cases, you can't do that, you can't lump together

22    defendants in jurisdictional analyses.

23              And it makes sense why.  Because we're talking about

24    due process considerations.  If I could simply say I'm suing

25    somebody from Florida, somebody from Canada, somebody from
```

1    Cypress, and somebody from Russia, defining them as defendants

2    and saying all about their contacts with the United States,

3    they have no ability to argue against that because they have no

4    ability to parse through what their alleged contacts are.

5            We make this argument in our motion, Your Honor.

6            They do not respond to it in their opposition.  It's

7    not a feeble response or citing some case law from another

8    jurisdictional response.  It's crickets.  They failed to --

9    that alone is dispositive.  But I don't think, Your Honor, that

10   we're here to resolve it on that, because that could at least,

11   arguably, be cured by amendment.

12           We also have the facts.

13           We submitted in support of our motion to dismiss the

14   sworn declaration of a representative of Clover outlining in

15   great detail how Clover has no contacts; not only with the

16   United States, but particularly as well with Florida.

17           In opposition, what did they submit?

18           In opposition to Clover's motion, Your Honor -- they

19   submitted no evidence -- they submitted printouts from

20   websites, and I'll let my counsel explain -- excuse me -- my

21   co-counsel explain how even those percentages in the websites

22   aren't valid.  But they submitted printouts from websites

23   allegedly showing that 39 percent, I think, of our traffic

24   comes within the United States.

25           Your Honor ruled not that long ago in the MPS

1    Entertainment versus Headrush Apparel case that unauthenticated

2    documents cannot be used to rebut an affidavit submitted in

3    support of a motion to dismiss on personal jurisdiction

4    grounds.

5         So did Judge Marra, in the case of ArrivalStar versus

6    Axis Global in 2012.  They failed to rebut.  We all know the

7    common burden-shifting analysis, where they make the

8    allegation; we come forth with affidavit; the burden shifts

9    back to them to support their jurisdictional claims.

10        They failed to do that.

11        So, but again, we can -- moving on beyond that second

12   defect, so they lumped; impermissible.  They don't have any

13   evidence in opposition to our sworn evidence; impermissible.

14        But let's continue on.

15        Let's take it on the alleged context.  As I said, their

16   principal, if not only -- it's not only -- their principal

17   claim for contacts within the United States by Clover is its

18   ownership of a domain name of the website Sex.com.

19        And as we know, as case law says, "operation of an

20   interactive website is not sufficient to give jurisdiction."

21        If it were, as Your Honor noted at the beginning of the

22   hearing, in essence, every court in every jurisdiction

23   throughout this nation would be able to hail defendants who own

24   websites into their courts, because, by definition, a website

25   is accessible everywhere.  So that's not enough.

1        What is enough?  And again, this is the MPS

2   Entertainment case.  Your Honor made that point, that exact

3   point, as did the Eleventh Circuit in the Fraser versus Smith

4   case.

5        So the question is, all right, operation of interactive

6   website isn't enough.  You have to specifically target the

7   relevant forum with that website in order to subject yourself

8   to jurisdiction.

9        And we've got the -- it's in line with the Calder

10  versus Jones' test, where if you have an intentional tort

11  committed outside the jurisdiction and it's aimed at somebody

12  within the jurisdiction, that can be sufficient.

13        That's the principles in Advanced Tactical versus Real

14  Action, the principle is discussed in the Eleventh Circuit

15  cases of Louis Vuitton versus Mosseri and Licciardello versus

16  Lovelady.  And what we have here is let's step back and see if

17  they've alleged, established, submitted anything that shows

18  purposeful targeting of people -- and it's a little confusing,

19  because in their complaint they talk about personal

20  jurisdiction under 4(k)2, which is a national analysis.

21        In their opposition, they switch and they pivot and go

22  to Florida's long-arm statute, which is a Florida-based

23  analysis.  But for our purposes, Your Honor, although it's a

24  little difficult to figure out what exactly they're arguing, it

25  doesn't matter, because they don't have either.  There's no

1   purposeful targeting of either Florida or the United States.

2          They have -- accepting these printouts of the websites,

3   they have documents showing that Sex.com is accessible to

4   United States residents, and depending on who Your Honor

5   believes, access either 39 percent of the population or some

6   lesser percentage, I think, closer to --

7          MR. FRAY-WITZER:  Sixteen.

8          MR. PEGG:  -- 16 percent accesses in the United States.

9   Your Honor, taking that at face value, all that shows is that

10  the website is accessible.  It speaks nothing, literally

11  nothing to whether or not the website is being targeted.  It's

12  the defendant's conduct here -- not the users typing in in the

13  URL -- it's the defendants' conduct that shows nothing of the

14  defendants, Clover, in particular, was targeting the website.

15         And I don't want us to lose sight of a critical fact as

16  well, and this is one of the distinctions between Clover and

17  Maximum Apps.  Clover doesn't manage or operate the website.

18  That's set out in the sworn affidavit of Frederic Valiquette,

19  the other defendant.

20         Clover owns the domain name.  It has a contract with

21  the Canadian company Maximum Apps for the Maximum Apps to

22  operate and manage the website.  So even -- they don't have

23  evidence showing targeting; and even if they did, the targeting

24  wasn't done by us, Clover, because we don't manage the website.

25         And that was a very significant point to Chief Judge

1    Moore in the Atmos (phonetic) case.  He must have referenced --

2    I'm sure Your Honor's read -- in that case he must have

3    referenced the fact that the Alibaba defendant, who got out on

4    jurisdictional analysis, didn't operate the website no fewer

5    than six times.  And so -- and that's us.

6         We talked about the forum selection clause.  If

7    Your Honor cares, I can re-address that, but I think we went

8    through that.  And as Your Honor stated, in the International

9    Textile versus Interamericana Apparel case, it's irrelevant to

10   the personal jurisdiction analysis.

11        So this is all -- all these jurisdictional

12   considerations, every case that we cited, there were much more

13   substantial contacts with Florida, with the United States, and

14   the Court still found personal jurisdiction to be lacking.

15        Post-Daimler, post the Supreme Court decision in 2014,

16   the standard's even higher.  They haven't met it under the

17   pre-Daimler standard, they certainly haven't met it under the

18   post-Daimler standard; and as the Eleventh Circuit noted in the

19   Oldfield verus Pueblo case, "a primary concern in the fairness

20   analysis" -- which is the second prong, the constitutional

21   analysis of the jurisdictional consideration -- "is fairness to

22   the defendant."

23        And, Your Honor, I would submit, it would be patently

24   unfair to Clover to be hailed into this Court to defend against

25   these allegations that have nothing to do with this

1    jurisdiction.

2            Finally, as I said, and I won't belabor the point, we

3    still do have a process argument.  St. Vincent is a party to

4    the Hague.  We submitted it, along with our motion, affidavit

5    of a St. Vincent lawyer, saying that the way they tried to do

6    it -- that is, with a private process server in St. Vincent to

7    serve a foreign lawsuit -- is not valid under the laws of

8    St. Vincent; and hence, under the Hague, is invalid as well.

9            We pointed that out.  They didn't have any -- they

10   don't submit any legal opinion in opposition.  What they say,

11   Your Honor, is that because St. Vincent isn't a party to the

12   Hague conference on private international law, they don't have

13   to follow the Hague.

14           But in the same breath, on the same page in their

15   opposition, they say, but the -- St. Vincent actually does

16   consider itself to be a contracting party to the Hague.  So as

17   we set out in our papers, membership in that conference doesn't

18   matter.  It's whether or not you're a party to the Hague.

19           So they seemed to have realized that, because

20   nine-and-a-half months after they filed their lawsuit, July

21   2015 to April 12th, 2016, they seemingly served the right

22   document -- 'cause two months ago they served the wrong

23   document, the original complaint.  We pointed that out in our

24   response.  That complaint had been superseded.

25           They served the right document, the amended complaint,

1    by the, apparently, right means, an individual associated with

2    the high court in St. Vincent, and on the right person, a

3    representative of the director of Clover.

4           But as the Eleventh Circuit said in Harris versus

5    Orange, S.A., that was a 2015 case, from that circuit, the

6    plaintiff trying to serve someone in a forum jurisdiction, they

7    don't have to comply with the 120-day rule, under Rule 4 of the

8    Federal Rules, but they need to exercise diligence.

9           And if they fail to exercise diligence, the District

10   Court has the discretion to dismiss the case for untimely

11   service.  And, Your Honor, in that case, the plaintiff had

12   failed to serve the defendant within 268 days.  So that's just

13   been eight months.

14          Here, Your Honor, even accepting that they served us

15   properly in April 2016, that's nine-and-a-half months -- a

16   month-and-a-half more than in Harris -- that's nine-and-a-half

17   months after they filed their suit and seven-and-a-half moths

18   after we first pointed out their error and what they needed to

19   do when we walked through these issues in our motion to

20   dismiss.

21          So I think Your Honor would be within Your Honor's

22   discretion in finding that the April 2016 service was

23   insufficient as being untimely.

24          THE COURT:  Thank you, counsel.

25          MR. PEGG:  Thank you.

 1        THE COURT:  Counsel?

 2        MR. FRAY-WITZER:  Thank you, Your Honor.

 3        As I said, I represent Maximum Apps and Frederic

 4   Valiquette.  Maximum Apps is a Canadian company operated

 5   entirely out of Canada with Canadian employees.  They manage

 6   the content on a website that's accessible, as you pointed out,

 7   anywhere in the world, utilizing, Your Honor, servers that are

 8   located entirely in Canada.

 9        They have an IP address that is registered by a

10   Canadian company.  It's owned, Maximum Apps is owned by three

11   Canadian family trusts, and its director, Frederic Valiquette,

12   is, himself, a Canadian citizen and resident of Canada.

13        Maximum Apps manages the content on the Sex.com website

14   pursuant to an agreement that it has with Clover Holdings, a

15   St. Vincent company.  And it finds itself subject to suit here

16   by Hydentra, which, as you know, is operated out of the

17   Republic of Cypress.

18        So, Your Honor, I will start with what I consider to be

19   some of the low-hanging fruit -- and please stop me if I don't

20   need to -- but the plaintiff, shockingly, makes a general

21   jurisdiction argument first.  They make both the general and

22   the specific jurisdiction argument, but they make a general

23   jurisdiction argument.

24        General jurisdiction is governed by the Daimler case

25   and the Carmouche case from the Eleventh Circuit.  Both require

1   such extensive contacts with the forum that the defendants are,

2   essentially, at home here in the forum.

3          And the plaintiff argues general jurisdiction without

4   ever showing that the requirements of Daimler or Carmouche are

5   met, or even discussing those cases.

6          Chief Justice Moore had a similar situation just

7   recently.  Thompson versus Carnival Corporation, he decided it

8   just a few weeks ago, 2016, U.S. District, Lexis 41933, and the

9   quote from that case, Your Honor:

10          "The fact that the plaintiff's counsel devotes six

11   pages of its response brief to the personal jurisdictional

12   analysis, yet fails to cite either Daimler or Carmouche, is

13   inexplicable and borderline malpractice."

14          Maximum does not and has never had any employees in the

15   United States.  It does not and never had a bank account in the

16   United States, property in the United States, a telephone

17   number in the United States, an agent for service of process in

18   the United States, and all of that holds true for

19   Mr. Valiquette, too.

20          We cite the cases in our briefs.  The cases are legion.

21   General jurisdiction has been rejected routinely with companies

22   that have far more contacts with the forum than are present or

23   even alleged here.

24          And just as a note, in the Thompson case, Judge Moore

25   noted that the defendant at issue "had contractual

1   relationships with Florida companies, Florida bank accounts, a

2   relationship with the Florida Caribbean Cruise Association,

3   agreements to indemnify Carnival, and a forum selection

4   agreement with Carnival Cruise Lines," and general jurisdiction

5   was still rejected.

6           So, Your Honor, when you look at specific jurisdiction,

7   which is the only thing that really you can look at in this

8   case, it breaks down into, as I see it, eight factors that the

9   plaintiffs have alleged at all:

10          The first four for the defendants that I represent,

11  Your Honor, I sort of call them the "not us" factors.  My

12  brother's absolutely right, they lump all the defendants

13  together.  They said the defendants did this, the defendants

14  did that, it's impermissible.  We know that that's

15  impermissible.

16          The first thing that they say is, well, Sex.com, the

17  domain name was registered with Network Solutions.  Network

18  Solutions is here in Florida, therefore, there's a contact.

19  Well, it's not us.  We didn't register the domain name.

20          Clover registered the domain name, but we have nothing

21  to do with that.  Even if we did, we cite to you, and my

22  brother cites to you, tons of cases that the registration of a

23  domain name is immaterial.

24          Your Honor pointed out exactly why that's the case.

25          Network Solutions probably has tens of millions, if not

1    hundreds of millions of customers, I guess they would all be

2    subject to jurisdiction in this Court if the plaintiffs are

3    correct.

4         They note an agreement with a privacy service company,

5    Perfect Privacy, a Florida company; again, not us.  We have

6    nothing to do with that.

7         The registration of the Sex.com trademark with the

8    copyright office; not us, not our trademark.

9         This is all Clover.

10        The fourth "not us" factor, Your Honor, is the forum

11   selection agreement with Network Solutions.  Judge Moore, in

12   the Thompson case that I just mentioned, said precisely what

13   you pointed out, that the forum selection clause, first of all,

14   can't be enforced by a non-party to the forum selection clause,

15   and it also reminds us that, under Florida law, even if you had

16   a valid forum selection clause, you still need independent

17   basis for the jurisdiction.

18        So those are the "not us," they're not even us factors.

19   What does that leave the plaintiff with, with respect to

20   Maximum Apps and Mr. Valiquette?

21        Well, the first thing that they argue is that Maximum

22   Apps appointed a DMCA agent for the receipt of complaints of

23   infringement.  I think Your Honor knows, a DMCA agent is

24   appointed so that content owners have someone to complain to if

25   they believe that their content is being infringed on the

1    internet.  It's true that Maximum Apps has, as it is required

2    to, it has appointed a DMCA agent.  That person happens to be

3    located in Canada.

4         Our Canadian DMCA agent simply is there to accept

5    complaints that there is infringing content.  We cite for you

6    cases that say that "contact with Government agencies is not

7    part of the analysis of jurisdiction."  We also -- we cite that

8    the appointment of an agent itself wouldn't be enough.

9         But you also need to think about for a moment what they

10   are arguing.  They are suggesting -- if their argument is taken

11   to its natural conclusion -- that defendants -- or people who

12   host websites who are not in the United States should never

13   appoint a DMCA agent, because if you do, you're subjecting

14   yourself to U.S. jurisdiction.

15        They are saying that the very mechanism that Congress

16   put in place to protect content owners and to protect websites;

17   that if we take that step, that we've somehow subjected

18   ourselves to jurisdiction.

19        The answer will be that websites will not appoint DMCA

20   agents.  It's not what Congress intended.  It's not the public

21   interest.  They make the argument simply because the website is

22   accessible in the United States that that is enough.  I don't

23   think I need to belabor that.  Your Honor has already pointed

24   out the havoc that would wreak.

25        They next argue that we should be subject to

1    jurisdiction within the United States because, well, there are

2    lots of people who visit the Sex.com website from the United

3    States.

4         They provide you, Your Honor, with some statistics that

5    they have gotten from companies that admit, freely admit -- and

6    we've submitted the evidence of this -- that they do not have

7    the actual statistics for the Sex.com website.

8         What they have are estimates.  Here's what we think the

9    viewership is like based on what we know.  That's from --

10        THE COURT:  Would that make even -- would even

11   viewership contacts bring this case into being able to have the

12   kind of jurisdiction that they would need to bring suit in this

13   jurisdiction?

14        MR. FRAY-WITZER:  No.  It doesn't bring it within.

15   Even if it did, their statistics are wrong.  Their statistics

16   exclude mobile users who use a protocol called WAP.  The

17   companies that they cite admit to that.  We've provided the

18   actual statistics.

19        And the actual statistics show that it's about 16

20   percent of our overall traffic.  The Sex.com website is

21   accessed in 230 countries, India being one of the largest

22   countries with 23 percent.  And I have cited for Your Honor in

23   our brief, on pages 15 to 16, a slew of cases in the federal

24   courts where in case after case the court said, 16 percent, 20

25   percent, 18 percent, it doesn't matter, it does not establish

1    personal jurisdiction over the defendants.

2          As my brother pointed out, it's our conduct, it is

3    Maximum Apps' conduct in targeting the jurisdiction that makes

4    a difference, not whether or not a user that we don't have

5    control over accesses our website from a particular country.

6          THE COURT:  So let me ask this question:

7          Could you have a circumstance where the corporate and

8    cyber organization of parties could be constructed to a degree

9    to avoid having plaintiffs having been able to access a court

10   in order to redress their issues?

11         Meaning, knowing that you're going to have substantial

12   cyber contacts in another place, you organize in one place and

13   say, Judge, we don't -- this is just insufficient kind of

14   contacts.  Do you understand what I'm saying?  I'm probably not

15   phrasing it very artfully; it's late in the day, counsel.

16         MR. FRAY-WITZER:  I think I do, Your Honor.  And if I

17   understand what the question is, the answer is, as it is in

18   this case, my clients aren't hiding, they're in Canada.  They

19   can be sued in Canada, where their company's organized, where

20   the servers are located, where the individual is located, where

21   the employees are, where bank account is, where every bit of

22   this company operates out of Canada, that's where they can be

23   found.

24         Is it conceivable that there would be a defendant that

25   is hiding somewhere?  I suppose it's conceivable, Your Honor,

1   it just doesn't happen to be this case.  It is easy to find --

2   they have found my clients.  They know where they are, they

3   know how to sue them, they just need to do it in the right

4   place, which is Canada.

5       It's why the Supreme Court and the Eleventh Circuit and

6   this Court have all repeatedly said, you need to show that

7   these people are at home in the jurisdiction.

8       We are the opposite of being at home here.

9       There are no contacts that you can point to with

10  Florida, with the United States, that are directly -- a direct

11  line to my clients.

12      Does that answer the question, Your Honor?

13      THE COURT:  Yes.  Yes.

14      MR. FRAY-WITZER:  All right.  The last thing,

15  Your Honor, the final, sort of factor that the plaintiff points

16  to in trying to support jurisdiction, is advertising.

17      And there's a crucial distinction -- and it really is

18  essential -- that needs to be made because the plaintiffs point

19  to some cases and talk about to what extent the advertising by

20  a defendant can be used to establish personal jurisdiction over

21  that defendant.

22      But, Your Honor, in those cases, in all of those cases,

23  what we are talking about is a defendant who is advertising

24  their own products or services into a jurisdiction.

25      And the idea is, look, I'm advertising into the

1    jurisdiction because I want people to buy from me, to use my

2    service and, therefore -- if you do it enough -- I have

3    subjected myself to jurisdiction in that jurisdiction for

4    causes of action that arise out of that conduct.

5            Well, that's not what is alleged here.

6            Sex.com does not advertise its own services, period.

7            What they are talking about, the only thing that they

8    are talking about is, we're a website.  The website has banner

9    ads, sometimes they have pop-up ads, sometimes they have

10   pop-under ads.  But the advertisements aren't for us, we sell

11   space.

12           THE COURT:  But that's one of the things that the

13   plaintiff talks about, these ads and the banners and how they

14   contribute to the contacts.

15           MR. FRAY-WITZER:  Well, and that's what I'm saying,

16   Your Honor, is they do say that we have these ads, but the

17   cases they cite to don't talk about anything like that.

18           We are not advertising our services.  We are -- we sell

19   advertising space.  The company sells advertising space on the

20   website.  Primarily, and almost entirely, through advertising

21   brokers located outside of the United States.

22           And what happens is, these brokers say to some other

23   client, we can get you space on the Sex.com website, and then

24   they place their products there.  They're advertising their

25   products, not Sex.com.  All that they allege is that we accept

 1    advertising on our website.

 2          The idea that, for example, if you had a more

 3    traditional form of media, the *New York Times, USA Today*, that,

 4    by accepting advertising that someone wants to be seen in a

 5    certain place, that the newspaper itself is subjecting itself

 6    to jurisdiction in every place that it is seen, is exactly the

 7    opposite of what the cases say is required.

 8          But even if that wasn't the case, the cases are really

 9    clear that generalized advertising over the internet isn't

10    enough.

11          And two days ago, Judge Walker, in the Northern

12    District of Florida, issued a decision, Smith versus

13    Poley (phonetic) Expert, 2016, U.S. District, Lexis, 64104, and

14    that case is pretty on point.  And I just want to point out, in

15    that case, Willowridge, which was a Kentucky company,

16    advertised on its website that it was a worldwide seller of a

17    component product, essentially, they made a chemical that got

18    added to mulch.  The mulch got sold to Florida farmers.  It

19    turned out that the mulch ended up degrading the watermelon

20    crops, and so Willowridge made an additive that gets added to

21    the product.

22          And in allowing Willowridge's motion to dismiss for

23    lack of personal jurisdiction and -- in specifically addressing

24    this advertising question, because Willowridge is on the

25    internet, it's advertising on the internet -- it says it wants

1  to be a global provider of this product, and that's what the

2  plaintiff alleged; they said, hey, look, they're advertising

3  into the district for their own products and services, by the

4  way.

5      And in rejecting the argument, the Court said, putting

6  aside for a moment the fact that there's no nexus between

7  Willowridge's advertising on its website and the farmers use of

8  its products in Florida, this argument fails.

9      "Courts have consistently rejected the idea that where,

10  as here, a seller of goods uses a website to advertise its

11  goods to the world, the accessing of that website by someone in

12  a state subjects the seller to personal jurisdiction in that

13  state."

14      The mere fact that we provide space on our websites for

15  other companies to advertise simply is not a basis for personal

16  jurisdiction.

17      And finally, to wrap it up, what it all comes down to

18  after all of that is that there is an absolute and complete

19  causal link.  Even if any of these factors were relevant

20  factors, in a specific jurisdictional analysis, you still need

21  to then make the causal link between what you say we've done

22  and your injury.  So they allege that we have advertisers who

23  advertise within the -- to United States audience.

24      What they don't say is that any of that resulted in the

25  allegedly infringing material that appeared on our website.

1    They're not saying the advertising had any infringing material.

2    They're saying, we operate a website where users uploaded

3    material that infringes on their copyrights and their

4    intellectual property.  And, by the way, they also have

5    advertising space and people advertise there.

6          There is absolutely no connection, there's no nexus

7    between the two.  The cases really are clear that it doesn't

8    matter how many contacts you can establish with the forum under

9    specific jurisdiction, you still need to make that connection

10   between the contacts and the damages alleged, and they can't do

11   it, Your Honor.

12         THE COURT:  Thank you.

13         Counsel, as you may have surmised from my comments,

14   this jurisdiction causes me some concern, and I know that you

15   want to talk specifically about certain ways that these ads

16   are, but it seems as if you have a very specific relationship

17   here among each of the defendants, how they govern their

18   businesses, where they're located, and that the business

19   contact that they have are the kinds of business contacts that

20   anyone with a website would have, and you're really opening

21   floodgate jurisdiction here.

22         MR. FREEMAN:  I don't agree with that.  I --

23         THE COURT:  Tell me what makes their jurisdiction

24   special to the point that jurisdiction should be in the

25   Southern District of Florida.

1        MR. FREEMAN:  Well, a couple of things.  And I think

2   the jurisdiction should be within the United States under

3   4(k)2.  The fact that we're here is just a choice to be here

4   out of any choice under 4(k)2 of any district.

5        THE COURT:  So why -- what about 4(k)2 gives you

6   jurisdiction?

7        MR. FREEMAN:  I think, Your Honor, what it's going to

8   take is an understanding of a couple of things here.  First of

9   all, what we have is defendants that are acting in concert as

10  agents of each other.  You've got a defendant who owns the

11  domain and a defendant who's contractually obligated to operate

12  the domain, they're acting together.

13       They also are specifically utilizing what is a U.S.

14  property.  The courts have consistently recognized that a

15  domain name is a tangible property.  This tangible property,

16  Sex.com, is registered with the United States Copyright Office.

17  This tangible property, Sex.com, is registered with a Florida

18  registrar company here, in the United States.

19       But then on top of that, this specific website is

20  specifically targeted into the United States.  If you could

21  look just at even one item of what we presented, you look at

22  the press kit, which is Exhibit G on our response to Clover's

23  motion, Exhibit 57, on our response to the other defendants'

24  motions, it shows -- that's the defendants seeking advertisers

25  for their website.

1        And on that press kit they state, specifically, that 25

2   percent of their users are 100 percent American, and they have

3   a flag, an American flag right there.

4        I agree with some of what defense counsel has said,

5   when they say that we have to show that they intendedly,

6   specifically, targeted this forum, the forum, the United

7   States.  That press kit right there, that explains it

8   specifically.

9        But I think it also helps if you understand the

10  business as a whole, what these tube sites exist for.  These

11  tube sites exist for the sole purpose of selling advertising,

12  that's it.  Any other allegation of what they exist for just

13  simply isn't true and is just dressing.

14       They exist -- they make money solely from the selling

15  of advertising space.  The cost of the advertising space is

16  going to depend on the viewers.  How many viewers are they

17  getting?  Where are those viewers coming from?

18       Because those viewers for those specific advertisers on

19  the website means traffic conversion; meaning somebody's going

20  to click on their advertisement, go to that advertiser's

21  product, purchase the product.  So it has to be a specific type

22  of audience that is going to be viewing this website to make

23  the advertising space on the website valuable.

24       We know that Sex.com targets United States

25  sponsorships.  We've listed at least eight sponsors that are

1    here in the United States that are United States producers of

2    content, to have content links on their sites.  That is an

3    indication that they are targeting United States -- United

4    States audience.

5         And again, that press kit, they're specifically

6    advertising that they've got a large percentage of a United

7    States audience; because of that, it shows what their intention

8    is.

9         In addition to that, they have a white label, which

10   hasn't been addressed by the defendants at all.  What that is,

11   is that they sell a product that is -- two products that is

12   produced by a company out of Seattle, ICF Technologies,

13   producing live chats and live cams.

14        Sex.com dresses that up as their own product and then

15   sells that as if it was theirs; but it's not theirs, it's

16   ICF's, and they're in a contractual relationship, again, with a

17   U.S. company.  Again, it is an indication that they are

18   targeting United States viewers.

19        There was -- they took it off since we filed this

20   lawsuit -- there was a download banner that existed under each

21   and every single video, certainly to the plaintiff's videos

22   that were infringed on this website.  That download banner,

23   again, was a white label, it was selling another product, but

24   that product was the same as the gentleman that owned or

25   operated --

1          THE COURT:  But you see, what you're saying is, that

2     product wasn't their product, but it was something you could

3     put on their website; and if you click there, you finally got

4     something in the United States.

5          It's like -- you know, do you have children?

6          MR. FREEMAN:  I do have children.

7          THE COURT:  Have you ever read them that book, *If You*

8     *Give a Mouse a Cookie*?  Maybe it was just a favorite of mine

9     when I was a kid, so I always remember it when I think about

10    the law of unintended consequences.

11         MR. FREEMAN:  But this is not --

12         THE COURT:  If you give a mouse a cookie, then you have

13    to give them milk; and if you give them milk, then they have to

14    go to the bathroom.  But it doesn't mean that you have to call

15    the plumber just because you gave the mouse a cookie.

16         Those are unintended things that are connected.

17         THE COURT:  But they're not unintended in this

18    particular situation.  If you look at that downloaded banner

19    ad, it specifically has a U.S. flag on it.  It's specifically

20    being targeted to U.S. viewers.

21         Again, when you look at the circumstances -- now,

22    they're smart.  And I think a point you made in your

23    questioning to defense counsel hit the nail in the head.  What

24    companies are trying to do is outsource themselves out of the

25    United States and then still obtain huge United States

1    viewerships, be able to infringe United States copyrights and

2    then not be held accountable for them.

3          We can't go to Canada and enforce a United States

4    copyright.  You can't do it.  It doesn't work.

5          So when they're specifically targeting the viewers of

6    the United States, and they have all of these contacts, they

7    geo-locate with their advertisers, which specifically targets

8    U.S. viewers, they specifically have the sponsorships with U.S.

9    production companies, they specifically sell U.S. products.

10         But again, I'm going to go back to that press kit when

11   they are specifically advertising two potential advertisers to

12   sell the advertising space on their website, they specifically

13   say 25 percent of our viewers are a hundred percent American.

14         I mean, if there is not a piece of evidence that is

15   more indicative of what their intent is here, and that is to

16   target United States producers -- I'm not saying they're only

17   targeting United States viewers, but that's not what was

18   required.  What's required is that they do actually intend to

19   target the viewers here and then do so, and I think that we

20   have absolutely established that.

21         But I do want to make a comment about the DMCA agent

22   aspect, it's being misconstrued by the defense.  We have the

23   defense here who mentions the 18 U.S.C. 2257, we've got on

24   their website.  Also, on their website, they list a DMCA agent.

25         But they do more than that.  They also go to the United

1    States Copyright Office, they register themselves as an

2    internet service provider and then they register a DMCA agent.

3    If their only intent here was to honor the intellectual

4    property of others, they can list an agent to receive these

5    take-down notices and honor them.

6         But that's not all they did.  What they did is set

7    themselves up in a position to do those prerequisites to be

8    able to potentially argue safe harbors later.

9         The DMCA provides safe harbor provisions for people who

10   are registered and entities that are registered as internet

11   service providers and have a registered DMCA agent.  They did

12   those things.  There's other things that are required as well

13   for the safe harbors to apply.  But they took those steps.

14        Neither of those two steps have anything to do with

15   whether or not they would honor a take-down notice sent to a

16   notification e-mail or notification address listed on their

17   website.  They can do that and they can honor that.  But they

18   did more than that.  They anticipated being hailed into court

19   in the United States.

20        They also anticipate being looked at by United States

21   law enforcement.  That's why they have the 2257 compliance

22   records up there.  Those -- American law, if you're going to

23   broadcast in America, in the United States, it has to comply

24   with 18 U.S.C. 2257, which has to do with the notification and

25   listing and making sure that the models are over the age of 18.

1          If they're not anticipating or targeting the United

2    States viewers, why would they take the steps to do that?

3    Because they do know and they do anticipate and they do intend

4    to be here in the United States.

5          It is that intention, it is those acts and it is that

6    advertising here -- and it's not just the advertising that

7    they're talking about that they're selling -- it's their

8    advertising to their advertisers.  They're saying, we have a

9    big portion of U.S. viewers here and we want you to know that

10   so that you come back forward and you buy with us, because

11   that's important to you guys.

12         With regard to the stats, I would point out that

13   Maximum Apps produced to you one month of stats after this

14   lawsuit was filed, after they knew this lawsuit was filed.

15         If the stats are important, I would ask the Court to

16   give us the opportunity to see all of the stats for the year

17   prior to filing this lawsuit, 'cause I know it is incredibly

18   easy to manipulate your Google analytic stats.  It's incredibly

19   easy to buy traffic, like India, that is incredibly cheap

20   because it doesn't convert well and be able to manipulate your

21   stats.  We did produce things, admittedly, that are estimates,

22   but that doesn't mean the estimates are wrong.  It means that

23   they're estimates.

24         They pulled it for one month after they had an

25   opportunity to manipulate the stats, and I would assert that

1    that is what happened, and we would like to see the Google

2    analytics for the year prior to that.  But even with their

3    stats, 16 percent -- with their stats, actually, 26 percent of

4    desktop viewers and mobile device viewers are from the United

5    States.

6         Now, they pull that down by adding in something,

7    another factor.  And again, you can look at the stats and see

8    how many are from India.  But those are significant numbers.

9    And for advertisers that are going to pay to advertise on their

10   site, it's significant for them to know that the United States

11   is, essentially, their largest viewership.  They know it.  They

12   put the American flag on their website.

13        They tell their potential advertisers that they have

14   such a high viewership.  They intend to be here.  They don't

15   want to be sued here, but they intend to utilize and broadcast

16   to the United States viewership.

17        And that brings me to Mr. Lidikay's declaration.  What

18   was contested by the defendants in Mr. Lidikay's declaration

19   was whether or not there was a relationship with CHOOPA, in

20   New Jersey, and whether or not there's a relationship there or

21   not, or it's somebody else in Jersey, or there's something else

22   going on, what is not contested in Mr. Lidikay's declaration is

23   that what he detected in his forensic evaluation was that there

24   is a faster process for Sex.com coming into the United States

25   than he experienced in sending transmissions between where he

1    was at and Montreal, 16 percent faster.

2         So whether or not it's a peering agreement with

3    somebody at CHOOPA, or a peering agreement with somebody else,

4    or some other technology, what's true here is that they're

5    utilizing something to increase their speed by 16 percent.

6    That is important.

7         When your run sites like this, the speed of the site is

8    crucial 'cause, otherwise, your viewers are going to take off.

9    The faster the site, the longer the viewers are going to stay

10   there, the more valuable your advertising is.  Again, that

11   speed, that increase in efficiency, establishes an intent for

12   them to be here 'cause, otherwise, it's going to go a little

13   slower.

14        I think that we have set forth -- first of all, going

15   back to the fact that these two are agents of each other, one,

16   Clover would like to separate themselves from Max Apps and say

17   we've got nothing to do with it, but the truth is that they pay

18   Max Apps to operate this site.

19        They've had an opportunity to provide you a copy of the

20   domain management agreement, which, I guess, theoretically,

21   would show that they've got absolutely no control or no

22   management continuing on, but they didn't do that.  And you

23   have to wonder why they didn't do that.

24        And again, if that's an important issue, I'm going to

25   ask for permission and for leave of Court to be able to do

1   discovery and get a copy of that, because I bet it's not going

2   to say what they would like you to think it says, which is,

3   Clover has absolutely no responsibilities here whatsoever.

4        So you've got Max Apps, who is an agent of Clover,

5   you've got them clearly intending to operate within the United

6   States and intend to broadcast to U.S. citizens.  That gives us

7   the specific national jurisdiction when those broadcasts

8   include infringing content.

9        With regard to the service issue, Your Honor, the

10  allegations that nine-and-a-half months results in a lack of

11  diligence.  What I can tell Your Honor is that we started the

12  Hague process service at the same time that we started the more

13  informal service.  They were started simultaneously.

14       The reality is this.  Formal service through the Hague

15  takes a long time.  And when we also initially started it, the

16  amended complaint hadn't been done, so there was two things

17  going on at once throughout the Hague.

18       So I think that we have been diligent, there's nothing

19  we could have done different to get an earlier service date

20  than it was.  It just -- it is what it is when you serve

21  foreign defendants.  All right.

22       Thank you, Your Honor.

23       THE COURT:  Thank you.  All right.  Let's talk about

24  this case, the facts, and whether or not I should exercise

25  jurisdiction here.

 1              I wanted to have oral argument because I wanted to see

 2     my way through some of the factual allegations that plaintiff

 3     makes in this case in order to say that jurisdiction is

 4     appropriate.

 5              And what I really have found -- and the discussion here

 6     doesn't seem to change my mind based upon the arguments in the

 7     paper -- is that the plaintiff is basically aggregating factual

 8     information from the defendants in order to demonstrate

 9     personal jurisdiction over all of the defendants, and I do not

10     think that's appropriate.

11              Let's go the choice of law question which I ask early

12     on and nothing seems to have changed legally what has happened

13     here.  The forum selection clause is the selection clause

14     between the defendants and people they have contracted with or

15     have contracted with them.

16              It is with those contractual agreements that they have

17     been -- and I'll use this in quotes -- "forced" to avail

18     themselves of jurisdiction within the United States.  And as I

19     and the defendants pointed out, have said that alone does not

20     give you personal jurisdiction, as does registering a domain

21     name.

22              So let's talk about the jurisdictional aspects of

23     personal jurisdiction.  Is there, are what the plaintiff claims

24     arise out of at least one of the defendants' contacts with this

25     forum?  And they don't.

1          The non-resident defendants here -- and it's kind of

2     interesting and was pointed out, that everybody's trying to get

3     jurisdiction here, nobody's from here, including the plaintiff.

4     They didn't purposely avail themselves of this forum.  They're

5     here because plaintiffs made them come here.

6          There's none of the traditional minimal contacts that

7     would make us think that it would be appropriate for the

8     defendants to be sued here.

9          There's no evidence of an intentional tort aimed at

10    this state that the defendant would use to cause harm to people

11    here, it's just not evident.

12         Would it create a burden on the defendant?  Obviously,

13    they're not here.

14         Does Florida have any interest in adjudicating the case

15    here?  Nope.

16         Could you obtain relief in another forum?

17         You say you can't prosecute a case in Canada.  I don't

18    know that, but I don't think you have sufficient contacts to

19    prosecute one here.

20         As to the exercise of the jurisdiction under 4(k)2,

21    because both parties specifically posted about that, in looking

22    at Fraser versus Smith, 594 F.3d at 842, 850, the Eleventh

23    Circuit has specifically explained that the applicable forum

24    for minimal contacts analysis in the U.S., and I must engage in

25    a fact-specific inquiry.

1            The facts here don't point to it.  There's no way that

2     all of these guys doing business in Canada and doing what they

3     do, would ever think -- and oh, by the way, when we're setting

4     up our business model, we think we're going to be sued in

5     Miami.  It just doesn't follow.

6            Listen, I know that the plaintiff makes much of these

7     banner flags that point out the United States, that's -- I

8     would say that is the cyber business, and that would be anyone

9     who was in any other jurisdiction that would say, listen,

10    American customers are welcome, does not necessarily create the

11    contacts.

12           This would be -- I'm just imagining, you know, if we

13    follow this to a logical -- or illogical conclusion, a United

14    States Court may one day end up in a suit in Russia.  It's not

15    what we're supposed to do in terms of the analysis under

16    specific personal jurisdiction under the due process clause or

17    under 4(k)2.

18           Do I need to allow jurisdiction on discovery to see if

19    there's something I don't know?  I don't think there's any

20    facts here that would change with jurisdictional discovery.

21           The defendants have presented ample evidence that they

22    have no contacts with Florida, and I don't think additional

23    discovery would prove that.

24           Therefore, defendant Clover Holdings, Limited, motion

25    to dismiss amended complaint for a lack of personal

1    jurisdiction is granted.

2         Since there's no personal jurisdiction, there's no need

3    for me to make any finding about the service of process in this

4    case; and the same as to lack of personal jurisdiction applies

5    to the defendants in docket entry number 34, and their motion

6    is granted as well.

7         Thank you, counsel.  Have a good evening.

8         MR. PEGG:  Thank you, Your Honor.  Same.

9         MR. FRAY-WITZER:  Thank you, Your Honor.

10        COURT SECURITY OFFICER:  All rise.

11        (Proceedings concluded at 4:43 p.m. )

12

13              C E R T I F I C A T E

14

15      I hereby certify that the foregoing is an

16   accurate transcription of the proceedings in the

17   above-entitled matter.

18   May 23rd, 2016        /s/Glenda M. Powers
     DATE                  GLENDA M. POWERS, RPR, CRR, FPR
19                         Official Federal Court Reporter
                           United States District Court
20                         400 North Miami Avenue, 08S33
                           Miami, Florida 33128
21

22

23

24

25